# EXHIBIT 6
# Part 2 of 2

10

1    that we're going to --

2        DEPUTY COMMISSIONER BLONIEN:  They're very

3    conflicting, and I don't know if he understood when he

4    talked to his counselor and referred to the psych

5    report, he really meant the '96 psych report where he

6    said he had no responsibility, or the '02 psych report

7    where he took full responsibility.  And so since this is

8    only his first hearing, for Subsequent Hearing, I know

9    you want the record clear.

10        ATTORNEY SPARKS:  His statement to me was that he

11    shot the victim.

12        DEPUTY COMMISSIONER BLONIEN:  So that's in the '02

13    psych report.  I believe in the '96 psych report he said

14    he did not.

15        PRESIDING COMMISSIONER DAVIS:  Why don't we do this,

16    we'll go ahead and go through this part of this, that

17    will give us at least a chronology for now, and when we

18    get to this part of it, and then when we get to the

19    psych report, we'll cover that as well.

20        DEPUTY COMMISSIONER BLONIEN:  Okay.

21        PRESIDING COMMISSIONER DAVIS:  So we'll have

22    (inaudible).  Is there a third?

23        ATTORNEY SPARKS:  Maybe, but not right now.

24        PRESIDING COMMISSIONER DAVIS:  All right.  So we'll

25    have at least everything on the record for this time,

26    and then we'll get it from there.

27        ATTORNEY SPARKS:  Okay.

11

1      PRESIDING COMMISSIONER DAVIS:  Montenegro stated he

2    was involved in a fight with an unknown person who was a

3    female, he was sitting in a bar with friends, the

4    subject reports that he, that his friend, shot the

5    victim when the subject's friend saw the victim was

6    going to kill the subject.  Montenegro denies that he

7    killed the victim.  Montenegro states that his friend

8    killed the person, and he is angry that authorities did

9    not take any action against this person who is

10    reportedly the culprit and is now living in Mexico, in

11    spite that he has given information to the authorities.

12    Montenegro does not take any responsibility for the

13    incident, but states that he deals with the situation

14    differently, by walking away from situations, from the

15    situations again.  Montenegro does have, does --

16    Montenegro does not have any remorse for the incident.

17    Montenegro reports that he feels bad that a life was

18    lost in the incident, but reports that the victim would

19    have killed him if the victim was not shot.  Montenegro

20    states that initially he took the responsibility for the

21    incident, as he wanted to save his friend, who

22    reportedly, was trying to save the subject, but now

23    feels that he should not have taken responsibility for

24    the crime.  And it is clear that there are conflicting

25    reports within the same Board Report, so we'll make sure

26    that we cover all of those, and, as always, if your

27    client would like to change his mind at some point in

12

1    time and comment to the Board about any of this, we're

2    certainly more than willing to hear him; however, we

3    understand and appreciate that he has an absolute right

4    not to do so.

5        **ATTORNEY SPARKS:**  I think when I made my statement

6    about there might be another version is that he was

7    interviewed the last time concerning the crime by the

8    Board of Parole Hearings, and that's where he made a

9    sworn statement under oath, and that's what he would be

10   sticking to, since they don't send me but the summary of

11   the decision, and I didn't go through the C-File to look

12   at that, because after the interview, that's what he was

13   saying to me.  That would probably be where his version

14   would be today, that in fact the official statement that

15   he made to the Board of Parole Hearings, at his initial

16   Hearing, would be the one that he would stick with.

17   That's what he informed to me the other day, just

18   recently, with the help of the interpreter.  I'm not

19   sure what that one says since I haven't read it, but

20   that would be the one.

21       **PRESIDING COMMISSIONER DAVIS:**  We'll pull the

22   transcript and take a look at it.  In the interim,

23   however, we'll go through and talk about -- in terms of

24   prior arrests, there are no, there's no indication of a

25   juvenile arrest.  And in terms of adult arrests, the

26   only arrest was in 5 of 1992 for driving under the

27   influence.  At that time he used the name of Santiago

13

1    Garcia.  Do you recall the arrest in 1992,

2    Mr. Montenegro?

3        INMATE MONTENEGRO TRHOUGH INTERPRETER:  Nothing that

4    came to the Board.  I told you that I haven't been

5    arrested since '91.

6        PRESIDING COMMISSIONER DAVIS:  Okay, so the arrest

7    in 1992 using the name of Santiago Garcia is not you?

8        INMATE MONTENEGRO TRHOUGH INTERPRETER:  No.

9        PRESIDING COMMISSIONER DAVIS:  Okay.  Personal

10   Factors indicates that you were born in Mexico, you're

11   not married, and have no children?  And you are, you are

12   one of six children.  In terms of employment, you were

13   employed in a variety of positions including filleting

14   fish; working in, as a fieldworker for harvesting grape

15   crops?

16       INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

17       PRESIDING COMMISSIONER DAVIS:  I find that I have to

18   go through several places to try and find out more about

19   you in this report because it's not very consolidated.

20   You went through three years of grade school in Mexico?

21       INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

22       PRESIDING COMMISSIONER DAVIS:  Did you, was that the

23   extent of your formal education as a young person?

24       INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

25       PRESIDING COMMISSIONER DAVIS:  You were born and

26   raised in Mexico, you came to the United States

27   illegally in 1979?

14

1          INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

2          PRESIDING COMMISSIONER DAVIS:  And you were 23 at

3     that time, and you came with one of your brothers?

4          INMATE MONTENEGRO:  Si.

5          PRESIDING COMMISSIONER DAVIS:  And you would go back

6     and forth to your home, back into the United States

7     working?

8          INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

9          PRESIDING COMMISSIONER DAVIS:  Do you still keep in

10    contact with your family?

11         INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

12         PRESIDING COMMISSIONER DAVIS:  So you do have mostly

13    cards and letters and so forth?

14         INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

15         PRESIDING COMMISSIONER DAVIS:  Okay.  It indicates

16    that you began drinking beer at the age of 19, and would

17    drink three or four beers a day, that you really did not

18    drink to, to excess at any time?

19         INMATE MONTENEGRO TRHOUGH INTERPRETER:  No.

20         PRESIDING COMMISSIONER DAVIS:  And in this, this is

21    out of the psych, this is out of the 2002 psychiatric

22    report, and they also, they also indicate a, an arrest

23    for driving under the influence of alcohol in the

24    United States.  Were you ever arrested for driving under

25    the influence of alcohol?

26         INMATE MONTENEGRO TRHOUGH INTERPRETER:  That was

27    around (inaudible).

15

1    PRESIDING COMMISSIONER DAVIS:  Okay.  Did you use

2  your correct name at that time?

3    INMATE MONTENEGRO TRHOUGH INTERPRETER:  No.

4    PRESIDING COMMISSIONER DAVIS:  What name did you

5  use?

6    INMATE MONTENEGRO TRHOUGH INTERPRETER:  I think it

7  was Martinez.

8    PRESIDING COMMISSIONER DAVIS:  Okay.  Have you ever

9  been arrested other than that?  For anything?

10    INMATE MONTENEGRO TRHOUGH INTERPRETER:  No.

11    PRESIDING COMMISSIONER DAVIS:  Okay.  You used

12  marijuana for about three or four months.

13    INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

14    PRESIDING COMMISSIONER DAVIS:  Okay.  You never

15  served in the Armed Forces?

16    INMATE MONTENEGRO TRHOUGH INTERPRETER:  No.

17    PRESIDING COMMISSIONER DAVIS:  Let's see, this

18  indicates that you went up to five years in school in

19  Mexico.  It's going back to the probation officer's

20  report from some time back.  Did you, was it, did you do

21  all of your schooling in Mexico?

22    INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

23    PRESIDING COMMISSIONER DAVIS:  And it seems pretty

24  consistent in terms of drinking and so forth.  So, did,

25  how many members of your family came north with you?

26  Just your brother?

27    INMATE MONTENEGRO TRHOUGH INTERPRETER:  Excuse me?

16

1     PRESIDING COMMISSIONER DAVIS:  How many people came

2  up to the United States with you?  Just your brother?

3     INMATE MONTENEGRO TRHOUGH INTERPRETER:  Also one

4  sister and my parents did.

5     PRESIDING COMMISSIONER DAVIS:  Okay, so they all

6  came up?

7     INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

8     PRESIDING COMMISSIONER DAVIS:  And you stay in

9  contact with them as well?

10     INMATE MONTENEGRO TRHOUGH INTERPRETER:  (Inaudible).

11     PRESIDING COMMISSIONER DAVIS:  Would you describe

12  your, your family life as being fairly normal?

13     INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

14     PRESIDING COMMISSIONER DAVIS:  Anything unusual, no

15  abuse ...

16     INMATE MONTENEGRO TRHOUGH INTERPRETER:  No.

17     PRESIDING COMMISSIONER DAVIS:  Any alcoholism?

18     INMATE MONTENEGRO TRHOUGH INTERPRETER:  No.  They do

19  drink, but a little.

20     PRESIDING COMMISSIONER DAVIS:  All right, all the

21  other members of your family doing well, nobody's had a

22  problem with law enforcement?

23     INMATE MONTENEGRO TRHOUGH INTERPRETER:  No.

24     PRESIDING COMMISSIONER DAVIS:  Okay.  Good.  Is

25  there anything we haven't talk about regarding your

26  prior history, coming into the institution, that is,

27  your social history, your schooling, family life,

17

1   relations with family or friends, et cetera, that you

2   think is important for the Panel to understand, that we

3   haven't discussed so far?

4       **INMATE MONTENEGRO TRHOUGH INTERPRETER:**  No.

5       **PRESIDING COMMISSIONER DAVIS:**  All right.

6   Commissioner, do you have any questions?

7       **DEPUTY COMMISSIONER BLONIEN:**  I don't.

8       **PRESIDING COMMISSIONER DAVIS:**  Mr. Montenegro, if

9   you think of something as we proceed, if something else

10  comes to mind that you think is important that we

11  understand, please take the opportunity to just let us

12  know what that is.  All right.  And I'll ask you to turn

13  your attention to me.  Commissioner Blonien.

14      **DEPUTY COMMISSIONER BLONIEN:**  Mr. Montenegro, it's

15  my job to go over what you do in the institution since

16  your last hearing.  I'm going to go over your psych

17  report -- and I read your C-File, I've read the Board

18  report, and I saw you did a review of your C-File, so if

19  I forget anything or miss anything at the end of my

20  presentation, you can -- we'll have a discussion.  So,

21  your last hearing was June 18th, of 2002, and the

22  decision was for a four year denial, and the Panel

23  recommended that you become and remain

24  disciplinary-free, upgrade vocationally and

25  educationally, and participate in self-help.  So, your

26  classification score is 19, and your custody level is

27  medium A, and 19 is as low as possible for a lifer

18

1    inmate.  You, your counselor, Counselor Studebaker

2    (phonetic), completed the report in June of '06, and

3    Dr. William Garmard, G-A-R-M-A-R-D, completed his psych

4    report in March 29th of '02.  So, in, in looking at what

5    you've done in the institution, you have remained

6    disciplinary-free, you only have one 115, and that was

7    in 2002, right before your last parole hearing.  You did

8    have a 128 on 3/8/04 for contraband.  What did you have?

9        INMATE MONTENEGRO THROUGH INTERPRETER:  A 128,

10   probably, a classification, but I didn't go to work.

11       DEPUTY COMMISSIONER BLONIEN:  Oh.  It talks about a

12   single-edge razor blade, box cutter, inside his assigned

13   locker.

14       INMATE MONTENEGRO TRHOUGH INTERPRETER:  That's true;

15   that's another one.

16       DEPUTY COMMISSIONER BLONIEN:  And then you have one,

17   3/5/02, and that was about reporting to work, and that

18   since you did not get a shower after working, you would

19   not report to work until you showered, is what you said.

20   You got a 128 for that.  In total, you have one, two,

21   three, six 128s, which are minor.  So when we talk about

22   education, you're talking to the Commissioner, and it

23   was unclear to me whether you had three years of

24   education in Mexico or five years of education.

25       INMATE MONTENEGRO TRHOUGH INTERPRETER:  As I recall,

26   it was only three years that I went.  I went to school

27   here for about five or six years.

19

1    DEPUTY COMMISSIONER BLONIEN:  And you're in a

2    difficult position here because you've been terminated

3    from education, they feel you've worked really hard, but

4    you're as far as you can go.  And you haven't attained a

5    sixth grade reading level, so you're not eligible for

6    Vocational Training programs, correct?  You know that?

7        INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

8        DEPUTY COMMISSIONER BLONIEN:  So, before you came in

9    here, you were a fish cutter and a mushroom farmer, but

10   you haven't really been able to pick up a vocation here

11   that translates into the community easily.  But, you are

12   a worker.  You're a very good worker, and since your

13   last hearing, you've been a Porter, and you work in

14   Waste Management now.  And I looked at your reports from

15   your supervisor, and every single one since your last

16   hearing says you are excellent in every category, you're

17   on time, you do the job, you're enthusiastic, you're

18   respectful to staff, to other inmates -- so do you enjoy

19   this job?

20       INMATE MONTENEGRO TRHOUGH INTERPRETER:  Enjoy the

21   job, yes.

22       DEPUTY COMMISSIONER BLONIEN:  And did you do

23   Recycling too?

24       INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

25       DEPUTY COMMISSIONER BLONIEN:  So tell me about that.

26   Tell me about your job.

27       INMATE MONTENEGRO TRHOUGH INTERPRETER:  What I do

20

1    there, is I clean up the, the lard there, clean the cans

2    where they empty the garbage, somebody asks me, asks me

3    to clean an office, to wax it.

4        DEPUTY COMMISSIONER BLONIEN:  So, that's a skill

5    that translates into the community, whether you go to

6    California or Mexico.  Now you do have a U.S./INS hold

7    on you, correct?

8        INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

9        DEPUTY COMMISSIONER BLONIEN:  And after we talk

10   about what you've done in the institution, we're going

11   to talk about your parole plans.  You're also very

12   active in AA, and there's chronos in there from your

13   last hearing covering the years '02, '03, '04 -- are you

14   still in AA?

15       INMATE MONTENEGRO TRHOUGH INTERPRETER:  I'm

16   attending not at this moment, because there's been a lot

17   of lockdown.

18       DEPUTY COMMISSIONER BLONIEN:  Yeah.  And when you

19   attend, do you attend AA in Spanish?

20       INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

21       DEPUTY COMMISSIONER BLONIEN:  And I noticed on one

22   of the chronos your sponsor says that you are fully

23   participating, and you're very enthusiastic.

24       INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

25       DEPUTY COMMISSIONER BLONIEN:  So you've worked

26   through the steps?

27       INMATE MONTENEGRO TRHOUGH INTERPRETER:  Not yet, I

21

1   make some mistakes.

2       DEPUTY COMMISSIONER BLONIEN:  So, when Commissioner

3   Davis was reading about your crime, and about your

4   history, you said you didn't have a problem with

5   alcohol, that you were a social drinker, but the crime,

6   you know, was committed around a bar atmosphere, and I

7   know you're not talking about the crime, so I don't know

8   how much you were drinking that night, but one of the

9   concerns of the Panel would be if you were in a like

10  situation in a bar in a social atmosphere, if you would

11  have the same bad judgment, and what you've learned

12  inside the institution that would help you make good

13  decisions if you were released to the community.  And

14  I'd like you to tell me what you've learned in that

15  area.

16      INMATE MONTENEGRO TRHOUGH INTERPRETER:   I didn't

17  understand that.

18      DEPUTY COMMISSIONER BLONIEN:  We're worried about

19  the circumstances of your crime involved in a bar area.

20  So if released, what have you learned in prison that

21  would keep you from making bad decisions in the

22  community?

23      INMATE MONTENEGRO TRHOUGH INTERPRETER:   Well, the

24  time I've been here has taught me -- biggest mistakes I

25  made in my life.   And that is attending -- I believe

26  that if I were given a date, a release date, one day

27  that I would never go back to one of those.

22

1       DEPUTY COMMISSIONER BLONIEN:  And is there -- like

2   going through AA, people talk about the steps.  And they

3   talk about how the steps help them make better

4   decisions.  So, since he hasn't worked through any

5   steps, what's going to help him?

6       INMATE MONTENEGRO TRHOUGH INTERPRETER:  What would

7   help me is to hear what these people have gone through.

8       DEPUTY COMMISSIONER BLONIEN:  I know in this

9   institution, there's other programs available, like

10  anger management.  Has he tried to go to any of those

11  programs?

12      INMATE MONTENEGRO TRHOUGH INTERPRETER:  I know I

13  committed a violent crime.  That was in (inaudible).

14      DEPUTY COMMISSIONER BLONIEN:  I would think there

15  was a lot of anger involved in this crime.

16      INMATE MONTENEGRO TRHOUGH INTERPRETER:  (Inaudible).

17      DEPUTY COMMISSIONER BLONIEN:  He, does he read books

18  in Spanish to himself?

19      INMATE MONTENEGRO TRHOUGH INTERPRETER:  Very little,

20  not yet.

21      DEPUTY COMMISSIONER BLONIEN:  Do you know how to

22  read in Spanish?

23      INMATE MONTENEGRO TRHOUGH INTERPRETER:  (Inaudible).

24      DEPUTY COMMISSIONER BLONIEN:  A little?  That could

25  be a problem.  How little can you read?

26      INMATE MONTENEGRO TRHOUGH INTERPRETER:  To read like

27  this, take about five minutes.

23

1      **DEPUTY COMMISSIONER BLONIEN:**  That, that is

2      difficult.  When you were talking to the psych in '02,

3      Dr. Garmard, he stated that you have no mental health

4      issues, you have no mental illness, that you're lucky

5      enough to have no physical illnesses, he doesn't note

6      any drug abuse or alcohol abuse by history or in

7      remission.  And he gives you what we call a Global

8      Assessment Functioning score of 85, which means that

9      you're an extremely high functioning inmate and you

10     would be a highly functioning individual in the

11     community if released.  In talking -- he talked to you

12     right before you got this 115, and he states that the

13     inmate has not received any 115 violations for violent

14     behavior, and the one 115 that you did have was for

15     refusing to work, which you did.  "Therefore, it is felt

16     that he would pose a less than average risk for violence

17     when compared with this (inaudible) inmate population.

18     If released to the community, his violence potential is

19     estimated to be no higher than that of the average

20     citizen in the community."  And this is based on the no

21     evidence of previous violent behavior or any violent

22     behavior since your offense.  "Although he did flee the

23     scene of the crime and evaded arrest for six years and

24     formerly appeared to lack remorse for his crime, he has

25     since accepted full responsibility."  And there, he's

26     alluding to the fact that when he was talking to you

27     about the crime, that during the conversation, the

24

1    doctor states that you changed your story and

2    admitted -- he said, the doctor said, "However, when

3    more of his own words were quoted back to him, such as

4    his early admission that the gun was his, that he got

5    the gun out of the trunk of his friend's car, that he

6    threw the gun in the grass after the shooting when he

7    fled the scene, he suddenly admitted shooting the

8    victim.  When asked why he denied that it had to do with

9    jealousy over the woman, he simply said that he shot the

10    victim after the victim made a verbal threat against

11    him.  He then admitted that his mistake was to shot

12    another man over a verbal threat and said he regrets

13    everything that he did.  He told about how he had lied

14    in the past, saying that one friend shot the victim in

15    order to protect the inmate from being shot or that his

16    other friend, Pedro, was to be blame, not him.  The

17    inmate's sudden honesty in the middle of the BPT

18    evaluation is rare, and he is to be commended for taking

19    full responsibility for his actions."  When, we're not

20    going to talk about the crime, but I did want to ask you

21    about remorse for the victim.  Do you have a comment?

22        INMATE MONTENEGRO TRHOUGH INTERPRETER:  (Inaudible.)

23        DEPUTY COMMISSIONER BLONIEN:  Do you ever think

24    about the victim's family?

25        INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

26        DEPUTY COMMISSIONER BLONIEN:  In going over what

27    you've been doing in the institution, have I covered

25

1    everything? So, a typical day for you, you go to work,

2    correct?

3        INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

4        DEPUTY COMMISSIONER BLONIEN:  My recorder can't

5    (inaudible).  Do you work out?

6        INMATE MONTENEGRO TRHOUGH INTERPRETER:  A little.

7        DEPUTY COMMISSIONER BLONIEN:  Do you go to church?

8        INMATE MONTENEGRO TRHOUGH INTERPRETER:  Not really.

9        DEPUTY COMMISSIONER BLONIEN:  Do you, what do you

10   do?

11       INMATE MONTENEGRO TRHOUGH INTERPRETER:  I go to work

12   out after working, I go use the shower, wait for dinner.

13       DEPUTY COMMISSIONER BLONIEN:  I want to talk to you

14   about your parole plans.  I don't see any letters from

15   your family.

16       INMATE MONTENEGRO TRHOUGH INTERPRETER:  (Inaudible).

17       DEPUTY COMMISSIONER BLONIEN:  The letters have to be

18   new because four years is a long time and circumstances

19   change.  So, if you were deported to Mexico, where would

20   you go?

21       INMATE MONTENEGRO TRHOUGH INTERPRETER:  In Mexico,

22   where my parents have a house in Mexico.  And they told

23   me that I could live there as long as I wanted.

24       DEPUTY COMMISSIONER BLONIEN:  And do your parents

25   have a ranch?

26       INMATE MONTENEGRO TRHOUGH INTERPRETER:  No, they

27   have a home, but not a ranch.

26

1          DEPUTY COMMISSIONER BLONIEN:  And what city?

2          INMATE MONTENEGRO TRHOUGH INTERPRETER:  Colima.

3          DEPUTY COMMISSIONER BLONIEN:  Near Manzanillo?  Very

4     nice, where the volcanoes are.  Very nice.  And what

5     would you do for work?

6          INMATE MONTENEGRO TRHOUGH INTERPRETER:  My thoughts

7     are if I'm released one day is go plant corn, and also

8     raise cattle.

9          DEPUTY COMMISSIONER BLONIEN:  Where would you get

10    the cattle?

11         INMATE MONTENEGRO TRHOUGH INTERPRETER:  I would buy

12    them.

13         DEPUTY COMMISSIONER BLONIEN:  You have a lot of

14    money?

15         INMATE MONTENEGRO TRHOUGH INTERPRETER:  I don't, but

16    I can by working.

17         DEPUTY COMMISSIONER BLONIEN:  So do you understand

18    that if we parole you, we need a letter from your family

19    saying that you can live there, that they will help you

20    live until you can get a job, that there are job

21    opportunities there for you, and that their support for

22    you -- because after you've been in prison a long time,

23    to be free you need support to be successful.  Do you

24    understand that?

25         INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

26         DEPUTY COMMISSIONER BLONIEN:  And if by chance the

27    U.S./INS hold doesn't materialize, where would you live

27

1   in California?

2   INMATE MONTENEGRO TRHOUGH INTERPRETER:  I have an

3   aunt who I (inaudible).  She would give me a place to

4   work and a place to stay.

5   DEPUTY COMMISSIONER BLONIEN:  And where does she

6   live?

7   INMATE MONTENEGRO TRHOUGH INTERPRETER:  Santa Maria.

8   DEPUTY COMMISSIONER BLONIEN:  So you would need, you

9   know, a letter from her, saying that you could live

10  there, that she'll help you find work, that she'll give

11  you money until you find work.  How old are you now?

12  INMATE MONTENEGRO TRHOUGH INTERPRETER:  Fifty.

13  DEPUTY COMMISSIONER BLONIEN:  Okay.  So you're still

14  a young man, and when you do get out, you'll be able to

15  work.  But you'll have to have all this in order.  This

16  is your responsibility, because we can't just say we

17  think he's going to Mexico, we have to have

18  verification.  And it's a hard job for you to get that

19  verification, so you have to start work on it right

20  away.  And then in terms of what you do in the

21  institution, you have to do more.  You were given a

22  sentence of life with a possibility of parole, and you

23  have to earn your way out of here.  And the way you do

24  it is you work really hard, which you do; you don't get

25  any 115s or 128s, which you're good at; and you go to

26  programs that help you when you're released to make the

27  right decisions.  And then you come to Board and you

28

1    tell us what you've been doing, or you have chronos in

2    your file. So just going to AA is good, but it's not

3    enough. Do you have a question?

4        INMATE MONTENEGRO TRHOUGH INTERPRETER: What other

5    programs do you recommend?

6        DEPUTY COMMISSIONER BLONIEN: Well, you have to go

7    out there and see what's available. You talk to all the

8    other inmates that are in your situation that don't

9    speak English so well. I've been here and those inmates

10   do get dates, and you have to ask them what's caused

11   them to be successful. And it's different for every

12   inmate. If I tell you what to do, that's not you making

13   your decision to get you out. But there, there are

14   things out there, and you have the ability to do well.

15   So I hope you'll do that. We also sent out notices to

16   local law enforcement and interested parties, and

17   although I didn't receive any letters, the District

18   Attorney from southwestern Santa Barbara is represented,

19   and at the appropriate time, he will be able to ask you

20   questions and/or make a closing statement. And with

21   that I return to the Chairperson.

22       PRESIDING COMMISSIONER DAVIS: All right, thank you.

23   Mr. Montenegro, if we can just try this from a different

24   perspective perhaps, is there one of the steps that

25   you've been working on that you think about or that you

26   find especially appropriate for you?

27       INMATE MONTENEGRO TRHOUGH INTERPRETER: One of the

29

1    things I like to do is like a (inaudible) hobby card,

2    but they denied it.

3        PRESIDING COMMISSIONER DAVIS:  Okay.  With regard to

4    the Alcoholics Anonymous --

5        DEPUTY COMMISSIONER BLONIEN:  I need to turn the

6    tape over.

7        [Whereupon, the tape was turned over.]

8        PRESIDING COMMISSIONER DAVIS:  With regard to

9    Alcoholics Anonymous, is there one of the steps that,

10    that you have been listening to, that you think is

11    especially helpful for you?

12        INMATE MONTENEGRO TRHOUGH INTERPRETER:  I don't

13    remember any of them because most of the time

14    (inaudible).

15        PRESIDING COMMISSIONER DAVIS:  Okay.  That may be

16    something that I think you were -- you were given some

17    good advice earlier by, by Commissioner Blonien, and I

18    think that if you want to also follow-up with that idea

19    of maybe committing some of these steps to, maybe not

20    verbatim, but a good understanding of what they mean for

21    you in terms of the crimes, your feeling of remorse for

22    the victim, things that you can, that you can take an

23    active step in, would be helpful for you.  All right.

24    Commissioner Blonien, any other questions?

25        DEPUTY COMMISSIONER BLONIEN:  I don't.

26        PRESIDING COMMISSIONER DAVIS:  All right.  Does the

27    District Attorney have questions?

30

1         ATTORNEY CUTLER:  I do not.

2         PRESIDING COMMISSIONER DAVIS:  Mr. Sparks?

3         ATTORNEY SPARKS:  No, thank you.

4         PRESIDING COMMISSIONER DAVIS:  Closing then?

5         ATTORNEY CUTLER:  Just briefly, this was an

6    extremely stupid case, the only thought he demonstrated

7    was his ability to escape.  Now that the Commissioner

8    has quietly eviscerated his plans, i.e., she's exposed

9    the fact that he has modest vocational abilities, albeit

10   a good work ethic; he has modest employment skills;

11   limited employment opportunities, if any; he hasn't

12   taken advantage of the AA program; he has limited

13   literacy; and the picture is painted very grim for a man

14   who, however he wound up in Mexico or found his way back

15   to Santa Maria, could very well find himself back at the

16   dives on Bloosser Street in Santa Maria and committing

17   the same sort of crime that got him in here.  I ask that

18   you deny his request.  Submitted.

19        PRESIDING COMMISSIONER DAVIS:  All right, thank you.

20   Mr. Sparks.

21        ATTORNEY SPARKS:  To his credit, Mr. Montenegro has

22   completed some AA, he does have some contact with the

23   country of origin where deportation is eminent, so the

24   requirement that he complete some form of GED would be

25   nice, but perhaps either unrealistic because of his

26   motivation or unnecessary because of the status that he

27   would have as a foreign citizen.  Learning U.S. History

31

1    may not be something relevant for purposes of his status

2    as a foreign national.  I understand the Board of Parole

3    Hearings would like to see somebody become all they can

4    be while they're incarcerated -- he was pleasant with

5    the Panel today.  He's grown and matured while he's been

6    incarcerated.  He's only had one 115 recently, and that

7    was nonviolent.  The correctional counselor's report in

8    '02 deemed him to be a low threat.  That must mean that

9    he's doing some of the things, institutionally, that

10    would show that he would be a good citizen if released

11    to the community, because he's been a good citizen while

12    incarcerated.  This was, in my opinion, an unfortunate

13    set of circumstances that was aggravated by alcohol use

14    and would not likely happen again, particularly if

15    Mr. Montenegro abstained from the use of alcohol.  He's

16    talked about his plan of recovery, and has indicated

17    that that's not something he's interested in.  And he

18    does have employable skills from institutional work.

19    I'll submit it with that.  Thank you.

20        PRESIDING COMMISSIONER DAVIS:  All right, thank you.

21    Mr. Montenegro, now is your opportunity to address the

22    Panel directly and talk to us about your suitability for

23    parole.

24        INMATE MONTENEGRO TRHOUGH INTERPRETER:  Talk to you

25    about what?

26        PRESIDING COMMISSIONER DAVIS:  About why you feel

27    that you're suitable for a parole.

32

1      INMATE MONTENEGRO TRHOUGH INTERPRETER:  (Inaudible)

2  if I were to be released, I would go to Mexico and work

3  at a ranch down there.

4      PRESIDING COMMISSIONER DAVIS:  Is that all, sir?

5      INMATE MONTENEGRO TRHOUGH INTERPRETER:  Yes.

6      PRESIDING COMMISSIONER DAVIS:  All right, thank you

7  very much.  We will now recess for deliberations.

8               R E C E S S

9               --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

33

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2              D E C I S I O N

3    DEPUTY COMMISSIONER BLONIEN: We're on record.

4    PRESIDING COMMISSIONER DAVIS: I want the record to

5  reflect that all those previously identified as being in

6  the room have returned. And this is in the matter of

7  Santiago Montenegro, CDC number H-55090. The Panel

8  reviewed all information received from the public and

9  relied on the following circumstances in concluding that

10  the prisoner is not suitable for a parole and would pose

11  an unreasonable risk to society or a threat to public

12  safety if released from prison. We have come to this

13  conclusion first by the commitment offense: The offense

14  was carried out in an especially callous manner, and the

15  motive for the offense was very trivial in relation to

16  the offense. The conclusion, and these conclusions are

17  drawn from the statement of facts, wherein the prisoner

18  was convicted of the senseless death by use of a firearm

19  of the victim. We find that there is no previous

20  record. With regard to institutional behavior, we find

21  that you have programmed in a limited manner while

22  incarcerated, that you have seven 128(a) counseling

23  chronos, the last of which was in 3 of '05, and one

24  serious 115 disciplinary report, the last of which

25  was -- the only, actually -- occurred in 3 of '02. The

26  psychological report of March 2002 by Dr. Garmard was

27  S. MONTENEGRO  H-55090  DECISION PAGE 1  8/16/06

34

1  supportive, but is dated and does not consider the most

2  recent 115 disciplinary report.  With regard to parole

3  plans, we find that you do not have viable residential

4  plans in either the United States or Mexico, and do not

5  have acceptable employment plans in either the United

6  States or Mexico.  With regard to the 3042 notices, we

7  note that the District Attorney from Santa Barbara

8  County is here in person by representative, and does

9  oppose parole.  Nevertheless, we do want to commend you

10  for your attendance in AA in Spanish and your -- and

11  again, your attendance there -- and your work as a

12  Porter and in Waste Management with excellent work

13  reports for being on time, respectful to staff and

14  inmates.  However, these positive aspects of behavior do

15  not outweigh the factors for unsuitability.  And in a

16  separate decision, the Hearing Panel finds that you have

17  been convicted of murder, and it is not reasonable to

18  expect that parole would be granted during the next

19  three years.  We come to this conclusion first by the

20  commitment offense itself, in that the offense was

21  carried out in an especially callous manner.  The motive

22  for the crime was very trivial in relation to your

23  offense.  These conclusions are drawn from the statement

24  of facts wherein the prisoner was convicted of the

25  senseless death by use of a firearm of the victim, that

26  you have programmed in a limited manner while

27  S. MONTENEGRO   H-55090   DECISION PAGE 2   8/16/06

35

1    incarcerated.  Disciplinaries while incarcerated

2    includes seven 128(a)s, the last of which was in 3 of

3    '05, and one serious 115 disciplinary report, the last

4    that occurred in 3 of '02.  The psychological report of

5    March 2002 by Dr. Garmard was supportive, but dated, and

6    does not consider the most recent 115.  With regard to

7    parole plans, we find that you do not have viable plans

8    for the United States or Mexico, and do not have

9    acceptable employment plans for the United States or

10   Mexico.  With regard to 3042 notices, we note that the

11   District Attorney from Santa Barbara County is here in

12   person by representative and does oppose parole.  With

13   regard to recommendations, the Panel recommends that you

14   have no more 128s or 115s, and as available, that you

15   upgrade vocationally and educationally.  And in terms of

16   education, one of the things we want to recommend to you

17   is that you use your time to, as available, to

18   participate in programs that will help you with your

19   reading or being, with your comprehension, your ability

20   to retain what you read.  Work on things that have to do

21   with your AA or that you can begin to assimilate or

22   remember those steps so that you can use those in your

23   day to day decision-making process and can come to a

24   future panel where you can discuss how the, what you

25   have learned, either in your AA or in anger management.

26   Certainly this Panel is not here to offer or to promote

27   S. MONTENEGRO  H-55090  DECISION PAGE 3  8/16/06

36

1    one program over another, but any other programs that

2    you do participate in -- that you would be able to come

3    to a Panel and be able to talk to that Panel about what

4    you've learned and how that has made a difference in

5    your decision-making and how that will keep you from

6    committing any types of crimes.  When you do ultimately

7    receive a date -- and as available, that you participate

8    in self-help, and that you continue to earn positive

9    chronos.  And the Panel has recommended that a new

10   psychological report be completed, and that as part of

11   that report that they also review your ability to learn

12   and retain information.  Commissioner, is there anything

13   you would like to add?

14        **DEPUTY COMMISSIONER BLONIEN:**  Yes, you're going to

15   get a copy of this Board decision.  You have one of your

16   friends read it to you.  And you concentrate on what you

17   said to this Panel.  And do a better job.  Good luck.

18        **PRESIDING COMMISSIONER DAVIS:**  All right.  We wish

19   you the best of luck, sir.  We are adjourned.

20                          ---oOo---

21

22

23   PAROLE DENIED THREE YEARS          DEC 1 4 2006

24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   S. MONTENEGRO  H-55090  DECISION PAGE 4  8/16/06

37

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Don Larson, a duly designated
transcriber, VINE, MCKINNON & HALL, do hereby
declare and certify under penalty of perjury that
I have transcribed tape(s) which total one in
number and cover a total of pages numbered 1 - 36,
and which recording was duly recorded at
CORRECTIONAL TRAINING FACILITY, at SOLEDAD,
CALIFORNIA, in the matter of the SUBSEQUENT PAROLE
CONSIDERATION HEARING of SANTIAGO MONTENEGRO, CDC
No. H-55090, on AUGUST 16, 2006, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated NOVEMBER 10, 2006, at Sacramento
County, California.

_____
Don Larson
Transcriber
**VINE, MCKINNON & HALL**

# EXHIBIT 2



**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA**

| PLAINTIFF: THE PEOPLE OF THE STATE OF CALIFORNIA | FOR COURT USE ONLY |
|---|---|
| DEFENDANT: SANTIAGO MONTENEGRO* | |
| TYPE OF REPORT: PRESENTENCE REPORT | |

| Address: Santa Barbara County Jail | Hearing Date: October 30, 1992, 8:30 A.M. | Action #: SM-73867 |
|---|---|---|

| Dept.: I | Judge: Zel Canter | Defense Attorney: David Ogren, PD | Probation Officer: Kathleen Nunes | Area Office: Santa Maria |
|---|---|---|---|---|

| Arresting Agency: SMPD (09/04/91) | Bail/OR/Custody: Custody | Days Custody: 423 days (09/04/91 to 10/30/92) | Guilty By: Jury |
|---|---|---|---|

| Drivers Lic.#/State: N2683242/CA (suspended) | SSN: 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 | CII No.: A09905388 | FBI No.: 285209PA2 |
|---|---|---|---|

| DOB: 02/02/56; 09/18/64 | POB: Mexico Citizenship: Mexico | Height: 5'8" | Weight: 145 lbs. | Hair: Brown | Eyes: Brown |
|---|---|---|---|---|---|

| Race: Hispanic | Scars/Tattoos: Tattoos: "MLL" right forearm |
|---|---|

| Veh. Lic. #/State: None | Veh.Year: | Make: | Model: | Style: | Color: |
|---|---|---|---|---|---|

Charged With:

187(a) PC (MURDER), a felony.

Enhancements Alleged: 1203.06(a)(1) PC (PERSONAL USE OF A FIREARM), a felony; 12022.5 PC (USE OF A FIREARM), a felony.

Convicted Of:

187(a) PC (MURDER), a felony.

Enhancements Found True: 1203.06(a)(1) PC (PERSONAL USE OF A FIREARM), a felony; 12022.5 PC (USE OF A FIREARM), a felony.

Co-Defendant(s): None

Disposition: N/A

Settlement Agreement: None

Antonio Mora; Antonio Tijerena; Zefe Portillo; Ruben Acosta; Juan Ruiz Amaro; Antonio Martinez; Carmelo Sosa; Sergio Garcia; Mobis Martinez

1  THE OFFENSE:

2  Sources of Information:

3  Santa Maria Police Department Report #636392.

4  On November 13, 1985, Santa

5  Maria Police Officers responded to El Conquistador Bar, 210 S.

6  Blosser, Santa Maria, to investigate a shooting. Officers found

7  Antonio Hernandez Cardona, age 22, slumped in the right front

8  passenger seat of an automobile. Officers observed a gun shot

9  wound in the front of his neck, an ambulance was called and he

10 was taken to Marian Medical Center where he died at 2315 hours.

11 Doctors concluded the victim died as a result of a gun shot

12 wound to the anterior neck/chest, exiting through the back. A

13 second entry wound in the left shoulder revealed a .44 caliber

14 bullet. The victim was shot three times.

15 Investigation revealed the

16 victim was the alleged boyfriend of Liliana Beltran, and they

17 had been inside the El Conquistador Bar. Ms. Beltran left the

18 bar and went outside to the victim's car. The defendant

19 followed Ms. Beltran out to the car, sat down in the car and

20 tried to kiss her. The victim came out of the bar with two

21 friends, saw what was going on and pulled the defendant out of

22 the car. The victim and defendant verbally argued, the

23 defendant pulled a .44 magnum pistol from his waistband, and

24 fired three or four shots, killing the victim. The defendant

25 fled the area.

26 The defendant told officers

27 upon his arrest, he had hidden in a cardboard box in an alley

28 / / / / / /

- 2 -

1  until day light, had been in Reedley, California, Tijuana,

2  Mexico and  for the past two years had been living in Guadalupe.

3  PRIOR RECORD:

4        Sources of Information:

5        Records of CII, FBI and NCIC, DMV, local law enforcement,
        Santa Barbara County Probation Department.

6        Prior Findings/Convictions:

7

8        05/08/92  23152b VC (DRIVING UNDER INFLUENCE .08 OR MORE),
                  misdemeanor, #C133546, five years Court
                  probation, jail.  Named used:  Santiago Garcia.

9

10        Additional Arrest Information:

11        None.

12  DEFENDANT'S STATEMENT:              On October 15, 1992, this

                                    officer interviewed the

14  defendant at the Santa Maria Court Compound.  The defendant

15  stated he is innocent of the charge.  The defendant advised even

16  though the jury found him guilty, he does not know if he will be

17  sentenced to prison until his sentencing hearing.  He told this

18  officer "if" he is sentenced to prison, he would like to be in a

19  prison close to this area so his mother and girlfriend can visit

20  him.

21  VICTIM'S INFORMATION:

22        Victim's Statement:  This officer attempted to telephone
                              Josephine Hernandez, listed as sister
23  of the victim in the police report.  No address available.
    A message was left on a recorder to call this officer.  No
    one has called as of this date.

25        Restitution Information:  It is respectfully recommended
                                  the defendant be ordered to pay a
26  $10,000 restitution fine pursuant to Section 1202.4 PC.

27  SOCIAL HISTORY:

        Sources of Information:

28        The following information was obtained from the defendant.

- 3 -

PA-101

Family History:

    Father:  Efrain Montenegro was born in Mexico and works in Fresno, CA.

    Mother:  Susana Garcia resides in Guadalupe, CA.

    Siblings:  The defendant has one sister and four brothers residing in Grover City and San Luis Obispo, CA.

Marital History:  The defendant has never been married but has been living for the past two years with Lupe Mendoza.

    Children:  None.

Education:  The defendant completed four to five years of school in Mexico.

Employment/Financial Status:

    Employment History:  At the time of the defendant's arrest, he was working as a fish filleter at the Old Port Inn Fish Market, Avila Beach, CA, earning $6.00 an hour.  He reports he also worked in Fresno as a field worker in the grape crop.

    Assets:  None.

    Debts:  None.

    Monthly Income:  None.

    Monthly Expenses:  None.

    Ability to Pay Fine/Restitution/Probation Fees:

    The defendant does not indicate what fees he can pay.

Military:  The defendant has never served in the Armed Forces.

Medical History:  The defendant states his health is good, he has no disabilities, is not under a doctor's care and has never sought mental health counseling.

Abuse of Alcohol or Controlled Substances:

The defendant began drinking at age 19 and drinks four or five beers a day.  At times, he does drink hard liquor. The defendant has smoked marijuana, in the past, and denies use of any other drugs or narcotics.

- 4 -

1    Other Relevant Information:

2    The defendant does not have legal documentation to reside
     in the United States.

3

4    COLLATERAL INFORMATION:                    Deputy District Attorney

5                                               Steve Plumer submitted the

     following written statement:

6
         "This is a Prop 8 serious felony in which defendant
7        was convicted of murder, 2nd degree with personal use
         of a firearm per 1203.06 and 12022.5. Mandatory term
8        for 2nd degree + 187 = 15 years. 12022.5 adds 2
         years. Court has authority to strike the 12022.5 term
9        per 1170(h) if it determines there are circumstances
         in mitigation and states reasons on the record. We
10       are unaware of any such circumstances and recommend
         the full sentence of two years for the 12022.5 and 15
11       to life, consecutive."

12                                       Requests for information

13   were sent to the Deputy Public Defender and Santa Maria Police

14   Department. At the time of this dictation, no response has been

15   received. If one is received prior to the filing deadline, it

16   will be included.

17   EVALUATION:

18   SENTENCING CONSIDERATIONS:

19       The Offense:

20       187(a) PC (MURDER, SECOND DEGREE), a felony

21                         Sentencing Range:   15 years to Life

22       Enhancements/Special Allegations Alleged & Found True:

23       12022.5 PC (USE OF A FIREARM), a felony

24                         Term:  2 years consecutive

25       1203.06(a)(1) PC (PERSONAL USE OF A FIREARM), a felony

26                         Term:  Mandatory State Prison

27   / / / / / /

28   / / / / / /

                              - 5 -

<u>Designated Sentence Length</u>:

| 12022.5 PC: | 2 years consecutive |
| 187 PC: | 15 years to Life |

<u>Total Term</u>:    17 years to Life

<u>Discussion</u>:                              The defendant is now before

the Court for sentencing on

a charge of murder after being found guilty of the offense by a

jury trial.   Although the defendant was convicted by jury, he

still contends he is innocent and does not believe he will be

sentenced to prison until his sentencing date this month.

Circumstances of the offense indicate the defendant shot the

victim in cold blood.   The victim was not armed and the alleged

dispute over a girlfriend does not justify a crime of this

magnitude.

                              The defendant shows no

remorse for his actions and he successfully eluded law

enforcement officers for six years before being arrested,

although he was living and working in the vicinity of the crime.

                              It is felt the defendant

should be sentenced to State Prison in the consideration of

justice and in the interest of protecting society.   This is the

only consequence justifiable for the crime of murder.

<u>RECOMMENDATION</u>:                  It is respectfully

                              recommended that probation

be denied and that the defendant be committed to the Department

/ / / / / /

/ / / / / /

/ / / / / /

- 6 -

PA-101

1   of Corrections for a term of 17 years to Life and ordered to pay

2   a restitution fine in the amount of $10,000 pursuant to Section

3   1202.4 PC and Section 13967 GC.

4                                    Respectfully submitted,

5                                    SUSAN J. GIONFRIDDO
                                     CHIEF PROBATION OFFICER

6
    Approved for filing:

7
    _____          KATHLEEN NUNES
8   STEPHEN C. GREEN                  DEPUTY PROBATION OFFICER
    SUPERVISING PROBATION OFFICER

9
    I have read and considered
10  the foregoing report of the
    Probation Officer.

11
    _____
12  JUDGE OF THE SUPERIOR COURT

13  KN:dm (montenegro.san)
    Transcribed:  10/21/92

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

— 7 —

# EXHIBIT 3

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
JUNE 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
March 28, 2002

This is the second psychological evaluation for the Board of
Prison Terms on inmate Santiago Montenegro, CDC # H-55090.  This
report is the product of a personal interview conducted on March
28, 2002, as well as a review of his Central file and Unit
Health Record.  This single contact interview was for the
express purpose of preparing this report.

Due to the inmate's limited English, a staff translator assisted
with the interview.  The inmate was informed of the nature and
purpose of the interview and the lack of confidentiality
inherent in the present assessment.  He was also informed that a
report for the Board of Prison Terms would be prepared.  He
understood this and agreed to participate.

### PSYCHOSOCIAL ASSESSMENT

I.    IDENTIFYING INFORMATION:

Inmate Montenegro is a 46-year-old single Hispanic male.
His stated religious affiliation is Catholic (practicing,
attending church occasionally).  No unusual physical
characteristics were noted.  He denied the use of any
nicknames or of using any past aliases (such as "Antonio
Tijerina", which he used during his job as a fish cutter;
"Antonio Mora", which he used during his job at a mushroom
farm; or another name listed in his C-file, Santiago
Montenegro Garcia).

II.   DEVELOPMENTAL HISTORY:

Inmate Montenegro was the third of six in his family,
having an older sister, two older brothers and two younger
brothers.  He was born in Mexico and raised by both
parents.  He stated there were no prenatal or perinatal
concerns, or birth defects.  He had no abnormalities of
developmental milestones.  All speech, language and motor
development occurred unremarkably.

MONTENEGRO, SANTIAGO
CDC NUMBER H-55090
BPT MENTAL HEALTH EVALUATION
Page Two

He denied any history of cruelty to animals, or acts of
arson. He stated he had no significant childhood medical
history, and denied a childhood history of physical or
sexual abuse as either a perpetrator or a victim, or sexual
aggression.

III.  EDUCATIONAL HISTORY:

Inmate Montenegro had about three years of grade school in
Mexico.

IV.  FAMILY HISTORY:

Inmate Montenegro was born and raised in Mexico and came
illegally to the United States in 1979 (at the age of 23)
with one of his brothers. His parents are still living.
They spend a few months in Mexico and then come to the
United States for a few months, and go back and forth, he
said. He has regular correspondence with all members of
his family.

V.  PSYCHOSEXUAL DEVELOPMENT:

Inmate Montenegro states he is a heterosexual male. He
denied any history of high-risk sexual behavior or sexual
aggression, either prior to or since incarceration.

VI.  MARITAL HISTORY:

Inmate Montenegro was never married, but lived with Lupe
for a couple of years. He has fathered no children.

VII.  MILITARY HISTORY:

Inmate Montenegro denied any military history.

VIII. EMPLOYMENT/INCOME HISTORY:

Inmate Montenegro has worked on ranches as a field worker.
During the six years before he was arrested for murder, he
worked for two of those years in Mexico on corn
plantations, and when he was arrested, he was working as a

MONTENEGRO, SANTIAGO
CDC NUMBER H-55090
BPT MENTAL HEALTH EVALUATION
Page Three

fish cutter at one job, and as a mushroom farm worker on
another job. Since incarceration, he has not completed any
vocational training, but spent six or seven years in
school. Until recently, he worked in the laundry (he
explained that he recently lost that job due to
difficulties with his supervisor).

IX. SUBSTANCE ABUSE HISTORY:

Inmate Montenegro began drinking beer at age 19, and often
would drink 3-4 beers a day. However, he denied drinking
to excess, except once when he was arrested for a DUI in
the United States. He also reported using marijuana for
about 3-4 months only. He stated that the Board of Prison
Terms evaluation of January 16, 1996, was incorrect where
it stated that he had a history of alcohol and marijuana
abuse and continuous use of beer and marijuana from age 18
until he was arrested. He said this might have been a
misunderstanding during his interview with the psychologist
via a translator.

X. PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Montenegro has no prior diagnoses or serious
illnesses other than a tonsillectomy in December of 1998.
He has had no medical or psychiatric hospitalizations and
has had no serious accidents or head injuries. He has had
no history of suicidal ideation or suicide attempts. He
has had no seizures or any other neurological condition.
He has had no history of disabilities or significant
impairments.

He is on no medication at this time.

X. PLANS IF GRANTED RELEASE:

Should inmate Montenegro be given a parole date he states
that he would be deported to Mexico where he would live and
work with a friend in Colina, Mexico, who would give him a
job on a ranch taking care of cattle and planting crops.
He stated that his friend wrote a letter to the BPT, which
is in his C-file.

MONTENEGRO, SANTIAGO
CDC NUMBER H-55090
BPT MENTAL HEALTH EVALUATION
Page Four

### CLINICAL ASSESSMENT

XI.    **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate Montenegro appears to be his stated age of 46.  He
was appropriately dressed and groomed.  He was coherent,
cooperative, calm and alert during interview.  His speech
was clear and readily understandable.  He seemed to have no
difficulty understanding any English or Spanish that was
spoken during the interview.  His affect was normal.  His
flow of thought was normal with no hallucinations nor
delusions noted.  He was fully oriented and his
intellectual functioning is estimated to be in the above
average range.  His attention and concentration were
adequate for the purposes of this examination.  There was
no evidence of a mood or thought disorder.  His insight and
judgment appeared to be intact.  His showed good insight
into his commitment offense.

### CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| **Axis I:** | No contributory. |
| **Axis II:** | No contributory. |
| **Axis III:** | No contributory. |
| **AXIS IV:** | Incarceration. |
| **AXIS V:** | GAF equals 85. |

Should this inmate at this time be given a parole or
release date his prognosis for maintaining his present
gains in the community is excellent.

XII.   **REVIEW OF LIFE CRIME:**

Inmate Montenegro described the circumstances surrounding
his commitment offense.  He changed his story a number of
times.  First, when asked what mistake he made that day, he
said "Not leaving that area before all that happened" and,
"Never going to a place like that".  When asked what other
mistakes he made that day, he replied that he did not know.
He was unable to state the name of the victim, saying he
didn't know him.  He said, "I don't know how the man died,
the report said the man was found in a car."  He also
claimed that when the man was shot he was in another town:
Oceano, California (in the Santa Maria area).  When his own

MONTENEGRO    H-55090        CTF-NORTH        03/29/02        lrr

MONTENEGRO, SANTIAGO
CDC NUMBER H-55090
BPT MENTAL HEALTH EVALUATION
Page Five

words were quoted from an early police interview done with
a Spanish translator, he then admitted being in the parking
lot where the shooting happened, but said, "I was in
another town when the shooting happened".

However, when more of his own words were quoted back to him
(such as his early admission that the gun was his; that he
got the gun out of the trunk of his friends car; that he
threw the gun in the grass after the shooting, when he fled
the scene), he suddenly admitted shooting the victim.  When
asked why, he denied that it had to do with jealousy over
the woman, but simply said that he shot the victim after
the victim made a verbal threat against him.

He then admitted that his mistake was to shoot another man
over a verbal threat and said he regrets everything that he
did.

He told about how he had lied in the past saying that one
friend shot the victim in order to protect the inmate from
being shot; or that his other friend, Pedro, was to blame
and not him.

This inmate's sudden honesty in the middle of a BPT
evaluation was rare, and he is to be commended for taking
full responsibility for his actions.

XIII. ASSESSMENT OF DANGEROUSNESS:

A.    This inmate has not received any CDC-115 violations
      for violent behavior during his entire incarceration
      of 16 years.  He only had one CDC-115, which was on
      March 6, 2002 for refusing to work.  Therefore, it is
      felt that he would pose a less than average risk for
      violence when compared with this Level Two inmate
      population.

B.    If released to the community his violence potential is
      estimated to be no higher than the average citizen in
      the community.  This is based upon the following
      considerations: there is no evidence of any previous
      violent behavior, or violent behavior since his
      offense.  There was no history of prior arrests other
      than one DUI.  Although he did flee the scene of the

MONTENEGRO      H-55090       CTF-NORTH      03/29/02      lrr

MONTENEGRO, SANTIAGO
CDC NUMBER H-55090
BPT MENTAL HEALTH EVALUATION
Page Six

        crime, evaded arrest for six years, and formerly
        appeared to lack remorse for his crime, he has since
        accepted full responsibility for his offense.

XIV. <u>CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS</u>:

    A.   This inmate is responsible for his behavior. He has
        the ability to abide by institutional standards and
        has done so during his incarceration period.

    B.   This inmate has no mental health disorder, which would
        necessitate treatment either during his incarceration
        period or following parole.

    C.   Since this inmate denies having any alcohol or drug
        problem, no recommendations are made in this area.


*William Gamard, Ph.D.*

WILLIAM GAMARD, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad


*B. Zika, Ph.D.*

B. ZIKA, Ph.D.
Supervising Senior Psychologist
CTF-Soledad

WG/lrr

D:  03/28/02
T:  03/29/02

---

MONTENEGRO      H-55090      CTF-NORTH      03/29/02      lrr

DOCKETING
RECEIVED
RECEIVED
2007 FEB 20 AM 11:16
2007 FEB 20 AM 11:16
ATTORNEY GENERAL
LOS ANGELES
ATTORNEY GENERAL
LOS ANGELES
RANEL CARREON